Elizabeth CONDO, Plaintiff-Appellant,

v.

Thomas J. CONNERS, George Roberts, and Wendell Porterfield, Defendants-Appellees.

No. 09CA1130.

Colorado Court of Appeals, Div. VI.

May 27, 2010.

As Modified on Denial of Rehearing Sept. 16, 2010.

James C. Plott, Denver, Colorado, for Plaintiff–Appellant.

Jacobs Chase Frick Kleinkopf & Kelley, LLC, Michael H. Berger, Kathryn A. Reilly, Denver, Colorado, for Defendants–Appellees, Thomas J. Conners and George Roberts.

Kennedy Childs & Fogg, P.C., John R. Mann, Daniel R. McCune, Miles L. Buckingham, Denver, Colorado for Defendant–Appellee, Wendell Porterfield.

Opinion by Judge BERNARD.

Plaintiff, Elizabeth Condo (the assignee), appeals the trial court's summary judgment for defendants, Thomas J. Conners and George Roberts (collectively the partners), and Wendell Porterfield (the attorney), on her claims of tortious interference and civil conspiracy. We affirm.

## I. Background

The assignee is the former wife of Thomas Banner (the assignor), who was formerly a member of Hut at Avon, LLC (the LLC). The partners were the other members of the LLC, and the LLC was represented by the attorney.

As part of a divorce settlement, the assignor agreed to assign to the assignee his right to monetary distributions from the LLC. They submitted a draft of this assignment to the partners, seeking their consent as required by the LLC's operating agreement. The partners refused to consent to it. Despite this refusal, the assignor finalized and executed the assignment.

The partners subsequently purchased the assignor's one-third membership interest from him. According to the assignee, this act divested her of her putative contractual right to monetary distributions under the assignment.

As a result, the assignee sued the partners and the attorney for tortious interference with contract and civil conspiracy. The trial court granted the partners' and the attorney's motions for summary judgment on both claims because it concluded that the assign-

ment was void. Although we agree with the trial court that the assignment was void, we affirm, employing a different rationale. *See Negron v. Golder,* 111 P.3d 538, 542 (Colo.App.2004)(affirming trial court's ruling on different grounds).

## II. Standard of Review

We review de novo a trial court's summary judgment. *Relative Value Studies, Inc. v. McGraw–Hill Cos.,* 981 P.2d 687, 689 (Colo. App.1999). Summary judgment is proper only when the moving party is entitled to a judgment as a matter of law on undisputed facts. C.R.C.P. 56(c); *Civil Serv. Comm'n v. Pinder,* 812 P.2d 645, 649 (Colo.1991). The facts relevant to our analysis here are undisputed.

## III. Tortious Interference with Contract

■ For a claim for tortious interference with a contract to be viable, a valid contract must exist. *See Fasing v. LaFond,* 944 P.2d 608, 612–13 (Colo.App.1997) (citing *Grimm Constr. Co. v. Denver Bd. of Water Comm'rs,* 835 P.2d 599, 601 (Colo.App.1992)). Based on an anti-assignment clause in the operating agreement, we conclude that the assignment was void and, thus, the assignee's tortious interference action was not viable.

## IV. Validity of Assignment

### A. Colorado's Limited Liability Company Statutes and the Operating Agreement

#### 1. Colorado's Statutes

A member of a limited liability company is a person who has an ownership interest in it. § 7–80–102(9), C.R.S.2009. A "membership interest" includes the member's "share of the limited liability company's profits and losses ... and the right to receive distributions of [its] assets." § 7–80–102(10), C.R.S.2009.

After a limited liability company has been formed, an outsider may be admitted as a member if all members consent. § 7–80–701(1), C.R.S.2009. Normally, a member's interest in a limited liability company "constitutes the personal property of the member and may be assigned or transferred." § 7–80–702(1), C.R.S.2009. However, unless an assignee is admitted as a member of the limited liability company, the assignee is only entitled to the assignor's share of profits, income, or return of contributions, and shall have "no right to participate in the management ... and activities" of the limited liability company. *Id.*

A person to whom a portion of such an interest has been assigned or transferred, upon admission as a member, has "all the rights and powers and is subject to all the restrictions and liabilities of the assignor or transferor with respect to the portion of the membership interest assigned or transferred." § 7–80–702(3), C.R.S.2009.

Limited liability companies are governed by operating agreements, which are agreements "of all of the members as to the affairs of a limited liability company and the conduct of its business." § 7–80–102(11)(a), C.R.S. 2009. The operating agreement "governs the rights, duties, limitations, qualifications, and relations among ... the members, the members' assignees and transferees, and the limited liability company." § 7–80–108(1)(a), C.R.S.2009. The operating agreement may contain provisions concerning its "enforcement, interpretation, construction, [and] application." § 7–80–108(2.5)(a), C.R.S.2009.

The provisions of the operating agreement control over "any provision" of the statutes governing limited liability companies to the contrary, subject to exceptions that do not apply here. § 7–80–108(1)(a). The intent of the statutes governing limited liability companies is "to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements." § 7–80–108(4), C.R.S.2009.

#### 2. The Operating Agreement

Here, the operating agreement provides requirements that must be met before a member of the LLC may transfer any portion of his or her membership interest.

- Paragraph 10.1 states: "Notwithstanding anything to the contrary contained herein, *without the prior written approval* of all of the Members (which approval shall be within the sole and absolute discretion of each Member), a Member *shall not*

*sell, assign, pledge or otherwise transfer any portion of its interest* in the Company." (Emphasis added.)

- Paragraph 10.2 states: "If at any time any Member proposes to sell, assign or otherwise dispose of all or any part of its interest in the [LLC], such Member ... shall *first obtain written approval of all of the Members to such transfer pursuant to [Paragraph] 10.1 ....* " (Emphasis added.)

- Paragraph 10.6 states that, for purposes of the operating agreement, "restrictions upon the ... assignment ... of a Member's interest shall extend to any direct or indirect transfer."

- Paragraph 10.7(c) states that "no transfer of any interest" in the LLC "shall be effective for any purpose whatsoever" unless the person to whom the interest is transferred assumes the transferor's obligations and "shall have agreed to be bound by all the terms and conditions" of the operating agreement, in a writing "duly acknowledged, in form and in substance" reasonably satisfactory to the LLC's manager.

## B.  Analysis

■  Absent a contrary statutory provision, we construe a limited liability company's operating agreement according to the general principles of contract law. 1 *Ribstein & Keatinge on Limited Liability Companies* § 4:16 (2d ed.2008). We interpret the operating agreement by examining it in its entirety. *See Copper Mountain, Inc. v. Indus. Sys., Inc.,* 208 P.3d 692, 697 (Colo.2009). Our primary goal is to determine and effectuate the intent and reasonable expectations of the parties. *See id.*

■  Our reading of the statutes, the operating agreement, and the record leads us to several conclusions:

- The assignor was a member of the LLC and had a membership interest in it. Part of this membership interest was the assignor's right to monetary distributions from the LLC.

- The LLC had an operating agreement that set forth the rights, duties, limitations, qualifications, and relations among the members, the members' assignees and transferees, and the LLC.

- When read together, paragraphs 10.1 and 10.2 of the operating agreement limited the power of each member of the LLC to assign his or her interest in the LLC by requiring that all assignments had to be approved, in writing, by all other members.

- Under paragraph 10.6, the requirements imposed by paragraphs 10.1 and 10.2 applied to the assignment at issue here.

- Two of the members of the LLC expressly rejected the assignor's proposed assignment of his right to monetary distributions from the LLC. As a result, the requirements of paragraphs 10.1 and 10.2 were not satisfied.

- Therefore, the assignment was contrary to the operating agreement. We reach this conclusion because, under section 7–80–108(1)(a), paragraphs 10.1 and 10.2 of the operating agreement control over any contrary provisions of the statutes governing limited liability companies, including section 7–80–702(1) and (3).

- The controlling nature of paragraphs 10.1 and 10.2 of the operating agreement in our analysis is reinforced by the statement in section 7–80–108(4) that the statutes governing limited liability companies are to be interpreted "to give the maximum effect to the principle of freedom of contract and to the *enforceability of operating agreements.*" (Emphasis supplied.)

- Without the approval of the partners, the assignor did not have the power to assign his interest, or part of his interest, to the assignee.

- Because the partners did not approve the assignment, the assignee could not take the step required by paragraph 10.7(c) and agree in writing that she would be bound by the terms and conditions of the operating agreement. Under 10.7(c), the assignment was not "effective for any purpose whatsoever."

- Under section 7–80–701(1), the assignee is not now, and has never been, a mem-

ber of the LLC because all members did not consent.

- Because the operating agreement rendered the assignment ineffective for any purpose, the assignment was void.

These conclusions, based on analyzing the operating agreement in light of the relevant Colorado statutes governing limited liability companies, are supported by *In re Weiss*, 376 B.R. 867 (Bankr.N.D.Ill.2007). In *Weiss*, a Chapter 11 bankruptcy case, the petitioner argued that he did not have the power to assign his interest in several limited partnerships because his partners did not give prior approval. *In re Weiss*, 376 B.R. at 870. Each partnership was governed by an operating agreement that restricted the transferability of any interest in the business unless all the partners consented. *Id.* at 871.

The bankruptcy court agreed with the petitioner's argument. It held, under Illinois statutes similar to those we apply here, that

[a] transferee of a distributional interest may become a member of a limited liability company if and to the extent that the transferor gives the transferee the right *in accordance with authority described in the operating agreement or all other members consent.* These provisions clearly indicate that the profits or proceeds of a limited liability company are part of the membership interest, which cannot be transferred without following the procedures outlined in the operating agreement. In this case, all of the agreements prohibited the transfer of a portion of the membership interest without the appropriate consents.

*Id.* at 879 (emphasis in original) (citation omitted).

Our conclusion is also supported by cases addressing the assignment of contractual rights in other contexts. Such assignments, although generally permitted, may be prohibited by contract. *Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co.*, 874 P.2d 1049, 1052 (Colo.1994); *Parrish v. Rocky Mountain Hosp. & Med. Servs. Co.*, 754 P.2d 1180, 1182 (Colo.App.1988); *Scott v. Fox Bros. Enters., Inc.*, 667 P.2d 773, 774 (Colo. App.1983); *see Matson v. White*, 122 Colo. 79, 83–84, 220 P.2d 864, 867 (1950).

States generally follow one of two approaches in determining the sufficiency of provisions prohibiting assignments of contractual rights: the modern approach and the classical approach. The modern approach distinguishes between a party's "right" to assign and the "power" to assign. *See Rumbin v. Utica Mut. Ins. Co.*, 254 Conn. 259, 757 A.2d 526, 534 (2000)(collecting cases). Under this approach, a contractual provision prohibiting assignments operates only to limit a party's *right* to assign contractual rights, unless it includes language stating that nonconforming assignments shall be void or invalid, or similar language. *Id.* (citing *Bel–Ray Co. v. Chemrite (Pty.) Ltd.*, 181 F.3d 435, 442–43 (3d Cir.1999)) (providing examples of limiting language of anti-assignment provisions). In jurisdictions that follow the modern approach, a contract term that merely prohibits the right to assign contractual rights "gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective." Restatement (Second) of Contracts § 322(2)(b) (1981).

Under the classical approach, an anti-assignment clause renders a nonconforming assignment void even in the absence of "magic words." *See Travertine Corp. v. Lexington–Silverwood*, 683 N.W.2d 267, 272–74 (Minn.2004). According to this view, an anti-assignment provision that prohibits assignments, but which does not include language stating that nonconforming assignments shall be void or invalid, will be interpreted as limiting the power to assign. *Id.* at 273.

The *Travertine* court, in rejecting the requirement that "magic words" must be used to limit the power to assign, stated:

We will not impose formulaic restraints on the language that contracting parties may employ to craft an anti-assignment clause that limits the power to assign. We believe the best approach is to simply apply the plain meaning of the words employed by the parties. When a contract prohibits assignment in very specific and unmistakable terms, any purported assignment is void. Although requiring the use of specific language, such as "void" or "invalid"—as mandated by the Third Circuit ...—would

help to resolve any conceivable ambiguity about whether the parties intended to limit the "power" to assign rather than the "right" to assign, it is difficult to identify a clearer way to communicate an intent to deny a party the power to assign than to expressly say so.

*Id.* at 273–74.

Absent contrary statutory provisions, Colorado follows the classical approach when construing and applying contracts. *Parrish Chiropractic,* 874 P.2d at 1051, 1054 (holding that a post-loss assignment of benefits was unenforceable because it was made in violation of an insurance policy's anti-assignment provision that stated, "[i]nterest in this policy may not be assigned without *our* written consent" (emphasis in original)); *see Rumbin,* 757 A.2d at 533–34 (citing *Parrish* as an example of the classical approach). In *Parrish Chiropractic,* our supreme court reasoned that the policy interest favoring the free alienability of choses in action is outweighed by the public policy in favor of the freedom of contract "and the corollary right of the insurer to deal only with the party with whom it contracted." 874 P.2d at 1054–55. The supreme court then stated that

[t]o hold otherwise would be to force [the insurer] to deal with parties with whom it has not contracted, regardless of the fact that its policy contains an express contractual provision requiring its prior consent to any assignment of interests in the policy. The public policy of this state does not dictate such a result.

*Id.* at 1055 (citations omitted).

In applying *Parrish Chiropractic,* we recognize that the General Assembly has established a contrary rule regarding insurance contracts. Effective January 1, 1994, the legislature enacted a statute that required insurance contracts to allow insureds to assign payments due under their policies to hospitals or other health care providers. *See* Ch. 189, sec. 1, § 10–4–708.5, 1993 Colo. Sess. Laws 725–726; *see also* § 10–16–106.7, C.R.S. 2009.

However, we conclude that, where there is no contrary statute regarding the particular type of contract at issue, *Parrish Chiropractic* still stands for the general proposition that Colorado adheres to the classical approach when construing and applying contracts. First, the supreme court was aware of the statutory amendment concerning insurance policies when it decided the appeal. *Parrish Chiropractic,* 874 P.2d at 1055 n.9. Second, despite its awareness that the statutory change would affect future insurance cases, the supreme court nonetheless followed the classical approach in resolving the case before it. Third, the statute pertains to only one kind of contract—insurance policies—and there is no indication that the legislature intended to establish a general rule or policy regarding other kinds of contracts, such as operating agreements for LLCs. Fourth, in the sixteen years since *Parrish Chiropractic* was decided, the supreme court has not suggested that the statute's approach to insurance contracts has altered the broader public policy that the freedom of contract permits contracting parties to agree to limit the alienability of choses in action arising from their contract. *See City & County of Denver v. Dist. Court,* 939 P.2d 1353, 1361 (Colo. 1997) (citing *Parrish Chiropractic* for the proposition that Colorado recognizes a "strong policy of freedom of contract").

Thus, the holding in *Parrish Chiropractic* supports our conclusion that the assignment here was void because (1) under paragraph 10.6, the provisions of the operating agreement governed the assignment; (2) it was not approved under paragraphs 10.1 and 10.2; and (3) under paragraph 10.7(c), the attempted transfer of the assignor's interest in the LLC was ineffective "for any purpose whatsoever" because the provisions of the operating agreement were not satisfied.

Because of our conclusion that the assignment is void, we need not reach the assignee's argument regarding the severability of a voting provision in the assignment. *See Copley v. Robinson,* 224 P.3d 431, 434 (Colo.App. 2009). We also decline to evaluate the validity of the assignment based on public policy factors provided in the Restatement (Second) of Contracts section 178. Section 178 addresses the general enforceability of contracts and contractual terms, but it has no bearing on our analysis. Here, in contrast, the resolution of the issue before us relies on

Colorado's limited liability company statutes and provisions of the operating agreement.

We conclude that, for purposes of the assignee's tortious interference actions against the partners and the attorney, the assignment is void and unenforceable as a matter of law. Thus, the tortious interference claim fails, and we affirm the trial court's decision to grant summary judgment concerning this claim.

We take no position on any argument that the assignee may make in the dissolution proceeding that she is otherwise entitled to maintenance or to a modification of the division of marital property.

### V. Civil Conspiracy

In light of our conclusion that the partners and the attorney did not tortiously interfere with the assignment, the assignee has not demonstrated the existence of an unlawful overt act to support her civil conspiracy claim. *See Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo.App.2006). We conclude that the trial court properly granted summary judgment on that claim.

The judgment is affirmed.

Judge CARPARELLI and Judge LOEB concur.