**Elizabeth CONDO, Petitioner**

v.

**Thomas J. CONNERS, George Roberts, and Wendell Porterfield, Respondents.**

**No. 10SC703.**

Supreme Court of Colorado, En Banc.

Dec. 19, 2011.

James C. Plott, Denver, Colorado, Attorney for Petitioner.

Husch Blackwell LLP, Michael H. Berger, Denver, Colorado, Attorneys for Respondents Thomas J. Conners and George Roberts.

Kennedy Childs P.C., John R. Mann, Daniel R. McCune, Miles L. Buckingham, Denver, Colorado, Attorneys for Respondent Wendell Porterfield.

Chief Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this appeal, we review the court of appeals' determination that Thomas Banner's assignment of his voting rights and right to receive distributions to Elizabeth Condo ("the Banner assignment") was ineffective because it violated the anti-assignment clause in the Hut at Avon, LLC's ("the Hut Group") operating agreement. *Condo v. Conners*, 271 P.3d 524, 2010 WL 2105926 (Colo.App.2010).

Condo brought a tort action against the other members of the Hut Group, Thomas Conners and George Roberts, and the attorney who allegedly assisted them in purchasing Banner's membership interest in the Hut Group, Wendell Porterfield (collectively, "the defendants"). Condo claimed that the defendants' purchase of Banner's membership interest tortiously interfered with Banner's prior assignment to her and that this interference amounted to civil conspiracy because it was intended to destroy the value of her assignment.

The trial court ruled that the Banner assignment was void as against public policy because Banner made the assignment without the consent of the other members of the Hut Group and thus violated the duty of good faith in corporate dealings. Because both of Condo's tort claims against the defendants turn on the validity of the Banner assignment, the trial court granted summary judgment for the defendants.

On appeal, the court of appeals affirmed, but did so on the grounds that the Banner assignment violated the express terms of the Hut Group's operating agreement ("the Operating Agreement"), which states that the other members must approve of any transfer of any membership interest. *Id.* at —— — ——. The court of appeals further reasoned that, under the terms of the Operating Agreement and consistent with Colorado jurisprudence respecting anti-assignment provisions, Banner had no authority to make the unapproved assignment and thus the Banner assignment had no legal effect. *Id.* Because the Banner assignment was void, the court of appeals agreed with the trial court that it could not support Condo's tort claims against the defendants. *Id.*

Now, making two alternative arguments, Condo contends that the court of appeals erred in affirming summary judgment because, despite the absence of the other members' consent, the Banner assignment was nonetheless legally effective.[1] First, Condo asserts that the assignment was valid because, under a narrow interpretation of the Operating Agreement's anti-assignment clause, the anti-assignment clause only applies to the transfer of membership duties. Therefore, Condo argues, the transfer of membership rights, as here, can validly occur without the written consent of all members. Second, and in the alternative, Condo argues that even if the transfer violated the anti-assignment clause, it was still legally effective because the anti-assignment clause merely functions as a contractual duty placed on each member not to transfer his interest without the approval of the other members.

Condo contends that in the absence of a term that expressly states that an assignment is "void" or "invalid" (the so-called "magic words"), the parties to a contract retain the power to wrongfully assign their interests. Thus, Condo asserts, Banner had the power to voluntarily breach this duty and make the nonconforming assignment. While this interpretation opens Banner to a potential suit for breach of contract by the other members of the Hut Group, Condo contends that it also gives legal effect to the Banner assignment despite the fact that it violated the anti-assignment clause.

After considering the express terms of the Operating Agreement, Colorado law relating to LLCs, and the Restatement (Second) of Contracts, we are not persuaded. First, Condo's argument that the Banner assignment did not violate the Operating Agreement's anti-assignment clause because it sought to transfer only a membership right and not a membership duty is contradicted by both the Banner assignment itself, which purports to assign both a membership right *and* a membership duty, and the plain meaning of the anti-assignment clause, which extends to the unapproved transfer of all membership interests, including the right to distributions.

Second, we disagree that the anti-assignment clause functions as a mere contractual duty not to assign without the approval of all members, despite the fact that the Operating Agreement does not contain "magic words" proclaiming any nonconforming assignment "void" or "invalid." Instead, in light of our previous case law and in consideration of the rationale adopted in the Restatement (Second) of Contracts, we look to the present context involving a closely-held LLC and the plain meaning of the Operating Agreement. We conclude that the anti-assignment clause rendered Banner powerless to make this nonconforming transfer. Thus, we affirm the court of appeals' holding that the Banner assignment had no legal effect and that summary judgment was appropriate because

---

**1.** Although the present action between Condo and the defendants arises in tort, because the court of appeals affirmed summary judgment by finding that the Banner assignment was ineffec-

tive and therefore could not support Condo's tort claims, the issues we presently address must be resolved in accordance with limited liability company (LLC) and contract law.

Condo's tort claims necessarily fail in the absence of a valid, preexisting contract.

Accordingly, we remand this case to the court of appeals to return this matter to the trial court to enter judgment consistent with this opinion.

## II. Background

This appeal arises out of Thomas Banner's attempted assignment of a portion of his membership interest in the Hut Group to his former wife, Elizabeth Condo. Banner was a member of the Hut Group with a one-third ownership interest. As part of Condo and Banner's divorce settlement, Banner agreed to assign Condo his right to receive monetary distributions from the Hut Group. Additionally, Banner and Condo agreed that Banner would vote against all issues that required unanimous consent, unless Condo directed him to do otherwise, effectively assigning Condo his voting interest in the Hut Group.

Before executing this assignment to Condo, however, Banner first sought approval from the other members of the Hut Group, Thomas Conners and George Roberts. Article 10.1 of the Hut Group's operating agreement expressly provides that "a Member shall not sell, assign, pledge or otherwise transfer any portion of its interest in [the Hut Group]" "without the prior written approval of all of the Members." Additionally, Article 10.2 states: "If at any time any Member proposes to sell, assign or otherwise dispose of all or any part of its interest in the [LLC], such Member ... shall first obtain written approval of all of the Members to such transfer pursuant to [Article] 10.1 ...."

Accordingly, Banner drafted an instrument assigning his right to distributions and effectively transferring his voting right to Condo and sought the approval of Conners and Roberts. This first draft of the assignment explicitly recognized the LLC's anti-assignment clause (Article 10.1) and provided that the instrument was "subject to and conditional upon the Company's delivery of its consent hereto" and that "[i]f such consent is not obtained ... this assignment shall be of no further force and effect." Conners and Roberts refused to consent to the assignment.

In response, Banner and Condo drafted and executed a second instrument (the "Banner assignment"). This second draft similarly assigned Banner's right to receive distributions and effectively transferred Banner's voting interest to Condo.[2] In contrast to the first draft, however, the second draft did not acknowledge the Operating Agreement's anti-assignment clause and was not contingent on the consent of the other members. Conners and Roberts did not receive notice that Banner and Condo executed this second draft of the assignment, and the Banner assignment was submitted to the divorce court without any showing that it was in compliance with Article 10.1 of the Operating Agreement.

When Conners and Roberts learned of the unapproved Banner assignment, they contacted Banner and expressed their concern that it violated the terms of the Operating Agreement. Conners and Roberts sent Banner a letter explaining their unease that the assignment would effectively make Banner a noncontributing member of the Hut Group and would eliminate any incentive Banner had to assist in the Hut Group's continued financial success. To resolve these issues, Conners and Roberts, allegedly with the aid of their attorney, Wendell Porterfield, offered to buy-out Banner's interest in the Hut Group. After some negotiation, Banner agreed to sell his entire interest to Conners and Roberts for $125,000.[3]

Thereafter, Condo sued Conners, Roberts, and Porterfield for tortious interference with

---

**2.** The second draft effectively transferred Banner's voting right to Condo by providing that: "[Banner] shall, unless otherwise instructed by [Condo], vote against the majority on all matters that call for a unanimous vote of the members of the company."

**3.** The issue of whether Banner received a fair price for his interest in the Hut Group or whether he sold it at a "fire sale" rate is not presently before this court. Nevertheless, we note that the district court in the domestic matter between Condo and Banner found that $125,000 was a reasonable price for Banner's interest because it was a reasonable estimate of market value, and thus ordered him to disgorge the profits of the sale to Condo in a subsequent contempt proceeding.

contract and civil conspiracy. Her claims were based on the theory that (1) she was validly assigned the right to receive distributions from the Hut Group and (2) the defendants had conspired with Banner in bad faith to buy his interest at a "fire-sale" price and thereby destroy the value of her right to receive Banner's monetary distributions. Thus, Condo alleged that the defendants had conspired to interfere with the Banner assignment.

In granting summary judgment for all defendants, the trial court reasoned that both of Condo's claims turned on the existence of a valid assignment predating Banner's sale to Conners and Roberts. It ruled that the Banner assignment was invalid because it was made without the consent of Conners and Roberts. The trial court held that Banner's assignment to Condo was void as against public policy because his failure to receive the consent of the other members constituted bad faith in corporate dealings.

Condo appealed, and the court of appeals affirmed on other grounds. As a threshold matter, the court of appeals concluded that a reviewing court must interpret an LLC operating agreement in light of general principles of contract law. *Condo*, — P.3d at —. The court of appeals construed the anti-assignment clause to prevent the assignment of the right to distributions absent the consent of all members. *Id.* Accordingly, the court held that because two members expressly objected to the Banner assignment, "the operating agreement rendered the assignment ineffective for any purpose" and "the assignment was void." *Id.* at —.

The court of appeals further held that the present dispute was governed by what it believed to be our adoption of the "classical approach" to anti-assignment clauses in *Parrish Chiropractic Centers, P.C. v. Progressive Casualty Insurance Co.*, 874 P.2d 1049, 1052 (Colo.1994). Under the classical approach, an anti-assignment clause is interpreted as a restriction on the power of any member to assign an interest, and thus any nonconforming assignment has no legal effect.[4] *Id.* at 1054–55. Consequently, the court of appeals held that Banner had no authority to assign an interest to Condo absent the consent of the other members and that therefore it was proper for the trial court to grant summary judgment in the defendants' favor.

Condo petitioned this court for certiorari review of the court of appeals' decision, and we granted her petition.[5]

### III. Analysis

■■■ We review a trial court order granting summary judgment de novo. *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo.2004). In reviewing this order, we must view the record in the light most favorable to the nonmoving party—in this case, Condo. *Greenwood Trust Co. v. Conley*, 938 P.2d 1141, 1143 (Colo.1997). Summary judgment is appropriate "when the pleadings and supporting documents clearly demonstrate that no issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004).

---

**4.** The classical approach sits in contrast with the so-called "modern approach," as described in *Rumbin v. Utica Mutual Insurance Co.*, 254 Conn. 259, 757 A.2d 526, 534 (2000), which provides that, absent "magic words" stating that any nonconforming assignment is "void" or "invalid," an anti-assignment clause merely imposes a contractual duty upon each member to refrain from assigning any contractual interest. *Condo*, — P.3d at — (citing *Rumbin*, 757 A.2d at 534). Under the modern approach, because the anti-assignment clause is interpreted as a contractual duty, each party to the contract retains the power to willfully breach that duty. *Id.* Therefore, any transfer in violation of the anti-assignment clause is still legally effective and the

other, nonassigning parties to the contract can only enforce their rights under the anti-assignment clause by bringing a breach of contract action against the party that wrongfully assigned the interest. *Id.* (citing Restatement (Second) of Contracts § 322(2)(b) (1981)).

**5.** We granted certiorari on the following issue:

Whether Colorado courts should construe contractual anti-assignment clauses narrowly, and if so, whether Colorado public policy follows the modern approach to contractual assignments, as described in *Rumbin v. Utica Mutual Insurance Co.*, 254 Conn. 259, 757 A.2d 526 (2000).

Although the underlying matter arises under tort law, the present appeal turns on the validity of the Banner assignment under contract and LLC law because Condo's tort claims require the existence of a valid contract with which the defendants could have interfered. *Fasing v. LaFond,* 944 P.2d 608, 612–13 (Colo.App.1997) (reasoning that a claim for tortious interference with contract must be based on a valid contract); *Walker v. Van Laningham,* 148 P.3d 391, 396 (Colo. App.2006) (stating that one element of civil conspiracy is the existence of an unlawful act).

## A. Review under Contract Principles and the Terms of this Operating Agreement

■ Before addressing each of Condo's arguments on appeal, we address a threshold issue raised by the defendants, who claim that an LLC operating agreement should not be interpreted in accordance with prevailing contract law. The defendants argue that an LLC operating agreement more closely resembles a constitution or charter than a contract because it serves as an organic document for the LLC. Thus, the defendants assert that an operating agreement is much more than a multilateral agreement among the members and that it instead serves as a "super-contract" that explicitly restricts the power of any member to transfer any interest without complying with its express terms. Consequently, the defendants argue that Banner lacked the authority to assign his interest under the express terms of the Operating Agreement and any potential exception found within contract law is irrelevant. We disagree.

Under Colorado law, an " '[o]perating agreement' means any agreement of all of the members as to the affairs of a limited liability company and the conduct of its business." § 7–80–102(11)(a), C.R.S. (2011). An LLC's operating agreement serves as a multilateral contract among the members, who agree that the exercise of their membership and management rights and duties will be bound by the terms set forth. 51 Am.Jur.2d Limited Liability Companies § 4 (2011); *see also In re Seneca Invs. LLC,* 970 A.2d 259,

261 (Del.Ch.2008) ("An LLC is primarily a creature of contract, and the parties have wide contractual freedom to structure the company as they see fit."). This conclusion is consistent with the terms of the Hut Group's operating agreement, which states in the preamble that it "is entered into as of March 7, 2002, between T.J. Conners, George Roberts, [and] Tom Banner." Thus, the Operating Agreement itself is framed in terms of a multilateral agreement among the members and it is appropriate to interpret it in light of prevailing principles of contract law.

■ Accordingly, we review the Operating Agreement in light of such principles. In interpreting a contract, our primary goal is to determine and effectuate the reasonable expectations of the parties. *Thompson v. Md. Cas. Co.,* 84 P.3d 496, 503 (Colo.2004). Under Colorado law governing LLCs, a member's ownership interest in an LLC is normally treated as the personal property of the member and may be assigned or transferred. § 7–80–702(1), C.R.S. (2011). This general rule, however, may be abrogated by the express terms of an LLC's operating agreement. § 7–80–108(1), C.R.S. (2011) (establishing that an operating agreement may contain any provision, subject to certain exceptions—none of which are present here); *see also In re Albright,* 291 B.R. 538, 540 n. 6 (Bankr.D.Colo.2003). When the terms of an operating agreement do not conflict with existing law, Colorado law mandates that we give "maximum effect to the principle of freedom of contract and to the enforceability of [the terms]." § 7–80–108(4).

In the present operating agreement, Article 10.1 expressly states that "a Member shall not sell, assign, pledge or otherwise transfer *any portion of its interest* in [the Hut Group]" "without the prior written approval of all of the Members." (Emphasis added). Similarly, Article 10.2 states: "If at any time any Member proposes to sell, assign or otherwise dispose of all or any part of its interest in the [LLC], such Member … shall first obtain written approval of all of the Members to such transfer…." Condo does not dispute the language of Articles 10.1 and 10.2 of the Operating Agreement nor does

she dispute that Conners and Roberts never consented to the Banner assignment.

Although Condo concedes that the assignment appears to contravene the terms of the anti-assignment clause, she makes two alternative arguments as to why the unapproved Banner assignment was legally effective. First, Condo asserts that the assignment did not violate the anti-assignment clause because the clause should be narrowly interpreted to prohibit only nonconforming assignments of contractual duties. Thus, she concludes, the anti-assignment clause does not apply to an assignment of contractual rights. Second, Condo alternatively argues that even if the Banner assignment did violate the anti-assignment clause, the nonconforming assignment is legally binding nonetheless. This argument, Condo contends, has its genesis in the modern approach to anti-assignment clauses, which Condo urges this court to adopt in light of the modern credit-based economy and the public policy in support of the alienability of contract rights. We address each of these arguments in turn.

### B. Application of this Anti-Assignment Clause

■ Condo argues that we should narrowly interpret the Operating Agreement's anti-assignment clause such that it only applies to the assignment of membership *duties* and places no limit on the ability of a member to assign his or her membership *rights*. *See* 9 Arthur L. Corbin, *Corbin on Contracts* § 74:39 (4th ed. & Supp. 2010) (noting that a prohibition on the assignment of rights is possible but that anti-assignment provisions "will be narrowly construed"); *see also Lone Mountain Prod. Co. v. Natural Gas Pipeline Co.*, 984 F.2d 1551, 1556 (10th Cir.1992) ("Generally, the law favors the assignability of contract rights, unless the assignment would add to or materially alter the obligator's duty or risk."). Condo claims that the present anti-assignment clause does not apply to the transfer of Banner's right to

receive monetary distributions.[6] Condo argues that unlike an assignment of Banner's duties to the Hut Group, the assignment of his right to distributions has no effect on the ownership interests of Conners and Roberts.

In the present context, however, this interpretation is too narrow given the plain meaning of the Hut Group's anti-assignment clause. *Thompson*, 84 P.3d at 501 ("[T]erms in a [contract] should be assigned their plain and ordinary meaning."). Although contract rights are generally assignable, this presumption may nevertheless be overcome by an express prohibition on such a transfer. *Parrish v. Rocky Mountain Hosp. & Med. Servs. Co.*, 754 P.2d 1180, 1182 (Colo.App. 1988); *see* Restatement (Second) of Contracts § 322 cmt. c (noting that this rule "depends on all the circumstances"). Further, in the context of an LLC operating agreement, Colorado law compels us to give "maximum effect" to the terms of the operating agreement. § 7–80–108(4).

As mentioned, Article 10.1 of the Hut Group Operating Agreement expressly states that "a Member shall not sell, assign, pledge or otherwise transfer *any portion of its interest* in [the Hut Group]" "without the prior written approval of all of the Members." (Emphasis added). Under Colorado law, a membership interest in an LLC is statutorily defined to include the "right to receive distributions of such company's assets." § 7–80–102(10). Additionally, Article 4 of the Operating Agreement explicitly sets forth the manner and timing of the Hut Group's mandatory distributions, which thus creates a right that each member may enforce under the Operating Agreement. Because the right to receive distributions is a component of the membership interest, it is impossible to read Article 10.1's express limitation on the transfer of "any portion" of a membership interest as anything other than a restriction on the assignment of such a right. *See also In re Weiss*, 376 B.R. 867, 879

---

**6.** Condo concedes that this argument does not hold true for Banner's effective assignment of his voting interest, which is a membership duty. Nonetheless, Condo asks us to retroactively reform the Banner assignment to delete the assignment of Banner's voting interest. Because we

reject Condo's argument and hold that the Hut Group's anti-assignment clause applied to both rights and duties, including the assignment of the right to distributions, we decline to address this argument.

(Bankr.N.D.Ill.2007) (interpreting substantially similar language in an operating agreement and concluding: "These provisions clearly indicate that the profits or proceeds of a limited liability company are part of the membership interest, which cannot be transferred without following the procedures outlined in the [LLC's] operating agreement."). Unlike the sample language in the treatises cited by Condo, the present anti-assignment clause appears to have intentionally employed the broadest possible language to prevent the unconsented transfer of any membership interest. *Cf.* Restatement (Second) of Contracts § 322(2)(a) (1981) (stating that a blanket prohibition on the assignment of "the contract" is presumptively treated as a bar on the assignment of a duty or condition and not a bar on the assignment of rights under the contract).

Hence, we agree with the court of appeals that the right to receive distributions, which is statutorily and contractually defined to be a portion of the membership interest, falls within the express application of the anti-assignment clause to "any portion" of the membership interest. Any other result would fail to give "maximum effect" to the language selected by the members in Article 10.1. *See* § 7–80–108(4).

## C. Application of the Modern Approach to this Anti–Assignment Clause

■ Having concluded that the Operating Agreement's anti-assignment clause applies to the transfer of both rights and duties, we address whether the unapproved Banner assignment was void or whether it became legally effective despite its failure to comply with the anti-assignment clause. If the anti-assignment clause rendered Banner powerless to make a nonconforming assignment, the assignment was void and the present claims cannot stand. If, in contrast, Banner had the power but not the right to make the assignment, the assignment can be said to have occurred—albeit wrongfully—and Condo's present claims against the defendants may survive summary judgment.

As emphasized, under the LLC statutes, we give "maximum effect" to the terms of the Operating Agreement. § 7–80–108(4). The

Operating Agreement's anti-assignment clause provides that: "without the prior written approval of all of the Members ... a Member *shall not* sell, assign, pledge or otherwise transfer any portion of its interest in the Company." (Emphasis added.) Giving "maximum effect" to this clause does not resolve whether this anti-assignment clause functions as (1) a duty not to assign without consent or (2) renders each member powerless to assign without consent.

Accordingly, we resolve this issue by examining the classical and modern approaches to anti-assignment clauses. Ultimately, pursuant to prevailing Colorado case law and in light of the approach set forth in the Restatement (Second) of Contracts, we conclude that the language of the Operating Agreement and the context of the present dispute rendered Banner powerless to make the unapproved Banner assignment.

We first note that the court of appeals resolved this issue by looking to what it considered to be our application of the classical approach in *Parrish Chiropractic Centers, P.C. v. Progressive Casualty Insurance Co.*, 874 P.2d 1049, 1051 (Colo.1994), and extending this principle to the context of an anti-assignment clause in an LLC operating agreement. *Condo*, —— P.3d at ——. Under the classical approach, an assignment made in violation of an express anti-assignment clause is void ab initio because the assignor is powerless to make a nonconforming transfer. *See id.*

Now, Condo urges us to depart from *Parrish Chiropractic* and adhere to the modern approach as set forth in *Rumbin v. Utica Mutual Insurance Co.*, 254 Conn. 259, 757 A.2d 526 (2000). Under the modern approach, an anti-assignment clause creates a duty by which a party is contractually obligated to refrain from making a nonconforming assignment, but does not restrict the power of a member to nevertheless do so. *Id.* at 530–31. Instead of classifying a nonconforming assignment as void, the modern approach treats this unlawful act as a breach of the duty not to assign, which can then be enforced by the other party or parties to the contract through a breach of contract action. *Id.* As adopted in *Rumbin,* the modern ap-

proach allows for parties to contractually restrict the power—again, as opposed to the right—to assign, but such a clause will only render the parties powerless to assign when it expressly states that any nonconforming assignment is "void" or "invalid." *See id.* at 531–33 (collecting cases that apply the modern approach); *see also Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 272 (Minn.2004) (adopting the classical approach, but characterizing the exception to the modern approach as the "magic words" requirement) [hereinafter, the "strict 'magic words' approach"].[7]

The Restatement, however, does not adopt the strict "magic words" approach, and instead states that whether an anti-assignment clause merely creates a duty not to assign turns on the language used and the context in which the contract is made. Restatement (Second) of Contracts § 322(2)(a) (1981) (noting that the general presumption that an assignment in violation of an anti-assignment clause is merely a breach of the contract and is therefore still legally effective, can be overcome if "a different intention is manifested" in the anti-assignment clause); *id.* cmt. c (explaining that it "depends on all the circumstances" whether the nonassigning contract parties are bound to perform any rights that are assigned in violation of the terms of an anti-assignment clause). Thus, although the Restatement is similar to *Rumbin* in that it creates a presumption in favor of treating an anti-assignment clause as a duty not to assign, given specific language in an anti-assignment clause and under the appropriate circumstances, it allows that an anti-assignment clause may render the parties powerless to assign, even in the absence of "magic words."

Applying our previous holding in *Parrish Chiropractic* and considering the rationale underlying the Restatement approach, we hold that the Operating Agreement rendered the parties powerless to assign any portion of the membership interest without the consent of all other members. Two of the rationales we applied in *Parrish Chiropractic* are pertinent to our resolution of the present matter. First, we highlighted the strong public policy in favor of freedom of contract—that is, the ability of a party to contractually restrict the ability of other parties to assign their rights and/or duties. *Parrish Chiropractic,* 874 P.2d at 1054. Second, we emphasized "the corollary right of the [nonassigning party] to deal only with whom it contracted." *Id.* at 1054–55. Thus, we applied the classical approach in *Parrish Chiropractic* to afford contracting parties the maximum flexibility to shape their contract within the confines of the law, while simultaneously allowing for the option of increased predictability and stability in contractual relations through the use of an anti-assignment clause. *See id.*

Condo contends that the strict "magic words" approach provides the best public policy because it maximizes the free alienability of contractual rights, while still protecting the other, nonassigning parties to a contract by allowing them to enforce their rights through breach of contract actions. In arguing that the free alienability of contractual rights is of paramount public concern in Colorado, Condo cites two recently enacted statutes in which the General Assembly mandated the free assignability of automobile insurance benefits, section 10–4–708.4(1)(a), C.R.S. (1996), and healthcare insurance benefits, section 10–16–106.7, C.R.S. (2011). Thus, Condo argues that the General Assembly has recently evinced a clear preference for the free assignability of contractual rights and that the time has come for this court to follow the majority of jurisdictions in adopting the modern approach.

We disagree. Initially, we note that section 10–4–108.4(1)(a), ensuring the assignabil-

---

**7.** We note, however, that despite a majority of jurisdictions having adopted the modern approach, not all of these jurisdictions agree that "magic words" are necessary to limit the power of assignment. *See, e.g., Bank of Am., N.A. v. Moglia,* 330 F.3d 942, 948 (7th Cir.2003) (applying the modern approach, but finding that the anti-assignment clause precluded the power of assignment despite the absence of "magic words," which are nothing more than "empty verbiage"); *Travertine,* 683 N.W.2d at 273 ("We will not impose formulaic restraints on the language that contracting parties may employ to craft an anti-assignment clause that limits the power to assign. We believe the best approach is to simply apply the plain meaning of the words employed by the parties.").

ity of automobile insurance rights, was subsequently repealed in 1997. *See* H.B. 97–1209 § 8. Further, we decline to interpret the enactment of section 10–16–106.7 as a statement of the General Assembly's general preference for the freedom of alienability over the freedom of contract, given the statute's narrow application within the context of healthcare insurance benefits. Notably, the General Assembly has not extended this principal to the arena of LLC law and the assignment of membership interests.

Thus, we reject Condo's argument and affirm the court of appeals' extension of *Parrish Chiropractic* to the present matter. Unlike the court of appeals, however, we do not treat *Parrish Chiropractic* as a blanket rejection of the modern approach to assignments as adopted by the Restatement (Second) of Contracts. *See Condo,* —— P.3d at ——. Rather, in light of the Restatement's express limitation that the application of the modern approach is necessarily dependent on the circumstances and the express terms of the operating agreement, we narrowly hold that the strict "magic words" approach is inapplicable to the present case. *See* 6 Am. Jur.2d Assignments § 27 (2011) ("Whether an attempted assignment ... must fail because the rights or duties are of too personal a character is a question which turns upon the express or presumed intention of the parties, which must be ascertained from the entire contract, giving due consideration to the nature of the contract and the surrounding circumstances.").

Pursuant to section 7–80–108(4), we are compelled to give the Hut Group's operating agreement "maximum effect." Although the statutory mandate that we give the terms of the Operating Agreement "maximum effect" does not resolve whether a assignment made without consent is legally effective, it does indicate a legislative preference for the freedom of contract over the free alienability of membership rights. Thus, this LLC statute does not preempt Condo's second argument; it helps to resolve it. Accordingly, and in light of the strong public policy favoring the freedom of contract, we agree that the plain meaning of the Operating Agreement's anti-assignment clause rendered Banner powerless to make the unapproved assignment to Condo.

Further, in the context of a closely-held LLC, such as the Hut Group, there is also a clear public policy in favor of allowing the members to tightly control who may receive either rights or duties under the operating agreement. *See Parrish Chiropractic,* 874 P.2d at 1055 ("To hold otherwise would be to force [the nonassigning party] to deal with parties whom it has not contracted, regardless of the fact that [the contract] contains an express contractual provision requiring its prior consent to any assignment of interests ...."); *see also* 1 Larry E. Ribstein, *Ribstein & Keatinge on Limited Liability Companies* § 7:5 (2011) ("[A]n assignment of financial rights could injure the nonassigning members by diluting the assignor's incentives to maximize the welfare of the firm. Thus, the parties should be able to control assignment by agreement.").

Given these circumstances and the plain meaning of the Operating Agreement, we hold that the nonconforming Banner assignment had no legal effect and cannot support Condo's underlying claims of tortious interference with contract and civil conspiracy. Accordingly, summary judgment was appropriate.

## IV. Conclusion

For the reasons stated above, we affirm the court of appeals' decision. We remand this case to the court of appeals to be returned to the trial court for proceedings consistent with this opinion.

Justice EID concurs in the judgment.

Justice EID, concurring in the judgment.

I agree with the majority's ultimate conclusion that Banner's purported assignment to Condo of his interest in the Hut Group, an LLC, was ineffective and therefore the assignment could not support Condo's tortious interference with contract claim, but I disagree with its reasoning. Here, the operating agreement plainly prohibits a member of the Hut Group from assigning "*any portion* of [his] interest" in the LLC without the written consent of the other members, which

did not occur in this case. Colorado's LLC statute provides that we are to give "maximum effect" to the enforceability of an operating agreement. § 7–80–108(4), C.R.S. (2011). Giving "maximum effect" to enforcing the operating agreement's anti-assignment language means that Banner's purported assignment to Condo was void from the start. In my view, section 7–80–108(4)'s "maximum effect" language ends the matter; it leaves no room for arguments, such as Condo's, that Banner had the authority to assign his interest to her under the "modern approach" to anti-assignment clauses, and merely opened himself up to a breach-of-contract claim by the non-consenting members by doing so. Because the majority bases its decision on whether we should adopt the "classical" or "modern" approach to anti-assignment clauses under contract law generally, maj. op. at 1117–19, I concur only in the judgment it reaches.

An LLC operating agreement "governs the rights, duties, limitations, qualifications, and relations among the managers, the members, the members' assignees and transferees, and the [LLC]." § 7–80–108(1)(a). According to the legislature, enforcement of an operating agreement is to be given "maximum effect." § 7–80–108(4); *see Elf Atochem N. Am., Inc., v. Jaffari,* 727 A.2d 286, 291 (Del.1999) (noting that language identical to section 7–80–108(4) gives members "a great deal of certainty" that their operating agreement "will be enforced in accordance with its terms"). Here, Article 10.1 of the operating agreement expressly prohibits assignments of *"any portion* of [a member's] interest" without written consent of the other members, and there is no dispute that such consent did not occur in this case. *See also* Article 10.2 (no assignments without the prior written approval of the other members). If we are to give "maximum effect" to the enforceability of the anti-assignment language, we must recognize that the operating agreement gave Banner no authority to assign his interest to Condo. Banner's purported assignment to Condo was void from the outset and had no legal effect. Condo therefore has no claim against respondents for tortious interference with her interest in the assignment.

Condo urges us to adopt the "modern approach" to anti-assignment clauses under which anti-assignment language imposes a contractual duty not to assign an interest, but does not withdraw the authority to assign in the first instance. *See Rumbin v. Utica, Mut. Ins. Co.,* 254 Conn. 259, 757 A.2d 526 (2000). In other words, under the modern approach, an assignor has the authority to assign his interest even though he has breached a contract; the anti-assignment clause merely opens him up to a breach-of-contract claim by other parties to the contract. *Id.* at 531–33. In my view, we need not consider whether Colorado recognizes the "modern" or "classical" approach to anti-assignment clauses with regard to contracts generally because the LLC statute answers the question in this case. Giving "maximum effect" to the enforceability of the anti-assignment language at issue here means that Banner had no authority to assign his interest to Condo. Because the "maximum effect" provision answers the question, there is no need to consider whether Colorado might adopt the "modern" approach to anti-assignment contractual provisions more generally.

The majority mistakenly concludes, however, that the "maximum effect" provision does not answer the issue of whether the anti-assignment language deprives Banner of authority to assign, or merely imposes a contractual duty upon him not to assign. Maj. op. at 1117. Instead, the majority suggests that the "maximum effect" language simply "indicate[s] a legislative preference for the freedom of contract over the free assignability of membership rights. Thus, this LLC statute does not preempt Condo's ... argument; it helps to resolve it." *Id.* at 1119. It is difficult to see, however, how a command to give "maximum effect" to the enforceability of the anti-assignment language is simply a "legislative preference." If "maximum effect" is given to the enforceability of the anti-assignment language, a purported assignment in violation of the anti-assignment language can be given no legal effect.

Further, any concern regarding the general "public policy in support of the alienability

of contract rights" is misplaced in this case. *Id.* at 1116. The LLC act has specifically addressed the assignability issue by establishing a default rule that membership interests "may be assigned or transferred." § 7–80–702, C.R.S. (2011). But the LLC act is clear that parties may reject its default rules in favor of their own. § 7–80–108(1)(a) (operating agreement provisions *"shall control over any provision of [the LLC act] to the contrary"* except as set forth in this section) (emphasis added); *see also Elf Atochem,* 727 A.2d at 291 (the operating agreement is the "cornerstone" of an LLC); § 7–80–108(4) ("It is the intent of [the LLC act] to give the maximum effect to the principle of freedom of contract...."). Here, the members have done just that—instead of permitting assignments, they prohibited assignments. Applying the "modern approach" in this case would create the same result as the default rule—namely, that Banner could make a valid assignment of his interest—thus violating the LLC act's command that the operating agreement "shall control" over the default rule.

Although the majority ultimately reaches the correct result, *see* maj. op. at 1119, its rationale is troubling for two reasons. First, the majority holds that whether an assignor had authority to assign his rights in violation of an anti-assignment provision depends upon the circumstances, and is an issue to be determined on a case-by-case basis. Maj. op. at 1119. The majority thus leaves open the possibility that, under different circumstances, the "modern approach" might apply to an operating agreement with anti-assignment language similar to this one. Maj. op. at 1119. This approach renders virtually every such anti-assignment provision open to challenge. Second, by resting its decision on general anti-assignment contract principles, the majority leaves open the possibility that other general contractual principles will be applicable to LLCs despite the "maximum effect" provision. In sum, the majority's opinion leaves LLC law unsettled and open to uncertainty. For these reasons, I concur only in its judgment.

I am authorized to state that Justice COATS joins in this concurrence.